# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 23-0795V

|  |  |
|---|---|
| REBECCA STREHL,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: October 8, 2025 |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Catherine Elizabeth Stolar*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On May 31, 2023, Rebecca Strehl filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") as the result of an influenza ("flu") vaccination received on September 23, 2021. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

**For the following reasons, I find that Petitioner has established past pain and suffering warranting an award of $140,000.00.**

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I. Procedural History

The case was assigned to SPU in October 2023 (ECF No. 10), and Respondent conceded entitlement in April 2024 (ECF No. 18). Three months later, Petitioner reported an impasse in damages discussions, and I permitted the parties were to submit any additional evidence and briefing (ECF No. 25). *See* Petitioner's Damages Brief filed Aug. 22, 2024 (ECF No. 26) (seeking $150,000.00 for past pain and suffering); Respondent's Brief, filed Nov. 7, 2024 (ECF No. 29) (countering $87,500.00); Petitioner's Exs. 17-18 and Reply filed Nov. 25, 2024 (ECF Nos. 30-31). Supplemental submissions were also permitted: specifically, Respondent's Sur-Reply filed Dec. 13, 2024 (ECF No. 33) (addressing the updated medical records at Exs. 17-18); Petitioner's Ex. 19 and Sur-Reply filed Apr. 28, 2025 (ECF Nos. 35-38) (addressing a pre-vaccination civil action). The matter is now ripe for adjudication.

## II. Authority

In another recent decision, I discussed at length the legal standard to be considered in determining SIRVA damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Matthews v. Sec'y of Health & Hum. Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

### III. Evidence[4]

#### A. Pre-Vaccination

Ms. Strehl was born in 1954. She was retired, and living with a long-term boyfriend, at the time of vaccination. Ex. 3 at 85. Her medical history included lower back pain and sciatica, anxiety, and insomnia – for which she took Xanax (alprazolam). *See, e.g.*, Ex. 3 at 78-80 (primary care record); *see also* Ex. 6 at 3-4 (lumbar spine MRI); *id.* at 10-19 (orthopedic evaluations).

On November 24, 2019, Petitioner slipped on a grocery store's wet floor, falling onto her right side and forward. Ex. 14 at 3. She declined urgent medical attention but developed new pain primarily in her left knee and right shoulder. *See* Ex. 14 at 3-5 (chiropractor); Ex. 3 at 51-54 (primary care provider ("PCP")).

On January 2, 2020 at Orthopedic Health of Kansas City, Paul Christopher Cowan M.D., met with Petitioner as a new patient. Ex. 6 at 6. Dr. Cowan noted that her remote history of right shoulder pain *seven years earlier. Id.* But since her recent slip and fall, she had new right shoulder pain and decreased range of motion ("ROM"). *Id.* at 6-8. Dr. Cowan diagnosed rotator cuff arthropathy,[5] noting that she could apply Voltaren (diclofenac sodium)[6] up to 4 times daily. *Id.* at 7-8. She was "not a candidate for reverse total shoulder arthroplasty [at that time, because] she ha[d] excellent range of motion and very minimal pain." *Id.* at 8. The right shoulder complaint, with pain rating 4/10, was last documented at a January 31, 2020 chiropractic appointment. Ex. 14 at 12.

Later in 2020, Steven Smith M.D. at Northlands Orthopedics treated Petitioner regarding the slip and fall injuries particularly to her left knee – assessed as a lateral meniscus tear and treated with a steroid injection followed by surgery and physical therapy ("PT"). Ex. 7 at 4-6, 13-14, 23-37.

---

[4] While I have not specifically addressed every medical record, or all arguments presented in the parties' briefs, I have fully considered all records as well as all arguments presented by both parties.

[5] Arthropathy is defined as "any joint disease." Dorland's Medical Dictionary Online (hereinafter "Dorland's"), *Arthropathy*, https://www.dorlandsonline.com/dorland/definition?id=4273&searchterm=arthropathy (last accessed Oct. 1, 2025).

[6] Voltaren (diclofenac sodium) is listed as an ongoing medication, in the context of appointments for Petitioner's left elbow and left knee, the at-issue left shoulder, and back pain. *See e.g.*, Ex. 7 at 4, 23, 27, 38, 48; Ex. 4 at 134; Ex. 15 at 3, 27-28.

3

In June 2021, Petitioner through attorney Phillip Holloway sued the grocery store regarding her slip and fall, in the Circuit Court of Platte County, Missouri. She specifically alleged a "left knee injury requiring surgery, along with injuries to her neck, back, left elbow, and right shoulder." Ex. 19 at 1-2; *see also id.* at 6, 8 (reflecting February 2023 settlement in which the grocery store paid Petitioner $50,000.00 for a left knee injury).

The evidence does not establish any history of pre-vaccination *left* shoulder pain or dysfunction. *See e.g.,* Ex. 3 at 10-12; Ex. 4 at 178-83; *accord* Response at 2.[7]

### B. Post-Vaccination

On September 23, 2021, Petitioner received the at-issue flu vaccine in her left deltoid, at a pharmacy. Ex. 1 at 3.

Twelve (12) days later,[8] on October 5, 2021, John C. Swab, D.O. at Northlands Orthopedics evaluated Petitioner – first noting that she had no current *right* shoulder issues. Ex. 7 at 38-39. She had a new[9] left shoulder injury that "interfered with sleep," was "present at rest," "aggravated by lifting the arm above the head, strenuous activity, and activities of daily living," and not significantly relieved by ice, rest, or NSAIDs. *Id.* On exam, the left shoulder displayed deltoid tenderness; reduced range of motion ("ROM");[10] "pain-related weakness" of 4/5; and positive Hawkins and Neers' impingement signs. *Id.* at 39. Dr. Swab tentatively assessed a rotator cuff syndrome and administered a subacromial steroid injection. *Id.*

On October 28, 2021, the PCP documented the ongoing left shoulder injury. Ex. 4 at 134-35. On exam, Petitioner could not lift her arm past 30 to 45 degrees in anterior or lateral directions; she could move posteriorly with some pain. *Id.* The PCP prescribed 10

---

[7] This is despite certain post-vaccination records suggesting a pre-vaccination left-sided injury, potentially associated with the slip and fall. *See, e.g.*, Ex. 4 at 134 (October 2021 record); Ex. 12 at 3. These records are likely inaccurate. They are not corroborated by any *pre-vaccination, contemporaneous* medical records or other evidence.

[8] Petitioner states that her "first report" of injury was on the day of vaccination, at the pharmacy. Brief at 4, 32. But that was not documented contemporaneously – only reported by Petitioner at a primary care encounter one month later. Ex. 4 at 134.

[9] The orthopedist Dr. Swab recorded that Petitioner's left shoulder pain had been present for "one week" and not associated with any injury, Ex. 7 at 38. But on a new patient questionnaire, Petitioner wrote that the injury began "2 weeks ago" and was "getting worse" *Id.* at 42, which is more consistent with the onset required for a Table SIRVA (which Respondent has already conceded).

[10] Specifically active range of motion ("AROM") was forward flexion ("FF") to 80 degrees; external rotation ("ER") 25 degrees; and internal rotation ("IR") to L3. Passive range of motion ("PROM") was FF to 150 degrees; ER 45 degrees; ER "90: 70"; and IR "90: 60." Ex. 7 at 39.

days' worth of Vicodin (hydrocodone-acetaminophen) for "a more comfortable night sleep." *Id.* at 136.[11] The PCP also ordered a November 4, 2021 MRI of the left shoulder, which showed:

1. Complex posterior and superior labral tear that involves the biceps origin.
2. Grade 2 strain [in] the infraspinatus muscle.
3. Small partial-thickness tear of the subscapularis tendon, superimposed on moderate tendinopathy.
4. Mild to moderate supraspinatus and infraspinatus tendinopathy with undersurface fraying.
5. Moderate acromioclavicular osteoarthritis.

Ex. 10 at 48.

On November 9, 2021, Dr. Swab recorded that Petitioner was experiencing "unacceptable" left shoulder pain. Ex. 7 at 49-50. Dr. Swab reviewed the MRI findings including "a moderate amount of glenohumeral osteoarthritis with degenerative changes noted over both the glenoid and humeral head." *Id.* at 50. He assessed primary osteoarthritis in the glenohumeral joint, which he targeted with a steroid injection. *Id.* at 46, 50. Petitioner did not return to Dr. Swab. *Id.* at 50.

Instead on January 12, 2022, she established care at OSI Orthopedics Sports Medicine. Ex. 8 at 25. She first met with a physician's assistant ("PA") who recorded her 10/10 pain rating, and exam findings of decreased ROM due to pain and weakness, as well as positive Hawkin's, Neer's, empty can, and drop arm tests. *Id.* at 26. The PA assessed superior labrum anterior to posterior ("SLAP") and partial-thickness rotator cuff tears. *Id.* at 27.

Two days later, OSI orthopedic surgeon Michael A. Boin, M.D. assessed "left shoulder pain due to rotator cuff tear, subacromial impingement, superior labral tear, and AC joint arthritis," for which he planned surgical intervention. Ex. 8 at 29.

---

[11] This October 28, 2021 record contains two potential inconsistencies. First, its history of present illness states that Petitioner "took a fall a couple of years ago and injured the *left* elbow and shoulder but before the vaccination last month had fairly good range of motion." Ex. 4 at 134 (emphasis added). But the records contemporaneous to that fall only indicate a *right* shoulder injury. Second, the October 28th record suggests current "*bilateral* pain." Ex. 4 at 134. This may be a reference to Petitioner's *prior* right-sided shoulder issues – because the record does not document any *active* right shoulder pain or other symptoms.

On February 21, 2022, Dr. Boin performed Petitioner's left shoulder arthroscopy with rotator cuff repair, arthroscopic biceps tenodesis, subacromial decompression, distal clavicle resection, and extensive debridement. Ex. 9 at 77. She went home that same day with a limited prescription for Norco, and an immobilizer sling. Ex. 9 at 63, 67-68.

At the two-week post-operative follow-up, Dr. Boin recorded that Petitioner's left shoulder pain was "improving" and she was doing home pendulum exercises. She would continue wearing the sling and start formal PT. Ex. 8 at 16. But since the left-sided surgery, she was experiencing new or at least worsened *right* shoulder pain warranting an MRI and PT evaluation. *Id.* at 16, 19.

At the March 7, 2022 Select PT initial evaluation, Petitioner had bilateral shoulder pain rated 7/10, and limited ROM.[12] The records further explain that the immobilizer prevented any "functional use of the left arm," requiring complete reliance on her right side. Ex. 13 at 3-5.

A March 14, 2022 MRI of Petitioner's right shoulder showed:

1. Marked attenuation of the superior rotator cuff limiting evaluation. Full-thickness, partial-width tear of the anterior supraspinatus footprint. Probable additional subacromial high-grade bursal-sided tear. Delaminating tear of the infraspinatus tendon. No definite tendinous retraction. Diffuse rotator cuff fatty atrophy sparing the teres minor.
2. Moderate to severe degenerative changes of the glenohumeral joint. Mild degenerative changes of the acromioclavicular joint.
3. Large glenohumeral effusion with evidence of chronic synovitis. Multiple intra-articular bodies.
4. Subacromial/subdeltoid and sub coracoid bursitis.
5. Full thickness tear or previous tenotomy[13] of the long head biceps tendon.

Ex. 11 at 7.

At the one-month post-operative follow-up, Dr. Boin recorded that Petitioner was doing well, her pain was well-controlled, she was attending PT, and she could stop immobilizing her left shoulder. Ex. 8 at 12. Dr. Boin's record does not address her *right*

---

[12] Specifically the left shoulder's PROM was flexion to 82 degrees, abduction 62 degrees, and external rotation 10 degrees. The right shoulder's AROM was flexion to 115 degrees, abduction 135 degrees, and external rotation 55 degrees. Ex. 13 at 4.

[13] There is no evidence that Petitioner ever underwent right shoulder surgery.

shoulder complaints – but four days later at PT, Petitioner reported a right-sided "torn RTC and biceps," and her plan to defer any surgical repair "until late summer or early fall." Ex. 13 at 35.

On April 19, 2022, Petitioner attended her 13th session at Select PT. She was apparently unhappy with her progress, and therefore decided to transfer care to a different facility. Ex. 13 at 51. From April 28 – May 11, 2022, Petitioner attended four sessions at Preferred PT. *See generally* Ex. 12. At the last session, her worst pain had decreased from 10 to 8/10, and her ROM was still abnormal. *Id.* at 18.[14] Afterwards, Petitioner transitioned from formal PT to home exercises. *Id.*

At a May 13, 2022 follow-up, Dr. Boin recorded that Petitioner's left shoulder was doing well, with no issues with pain. Ex. 8 at 8. An exam found: "Slightly decreased range of motion than expected at this point post-operatively. 130/50/L5. Good rotator cuff strength." *Id.* Dr. Boin assessed that the left shoulder's "slight post-operative stiffness… continues to improve." Dr. Boin also noted, but deferred evaluation, of the ongoing right shoulder issues. Ex. 8 at 8.

On August 25, 2022, Dr. Boin reiterated that Petitioner's left shoulder was "doing very well" with "no complaints" and PT "done." Ex. 8 at 3. An exam confirmed that Petitioner's left shoulder had regained full ROM and strength. *Id.* at 4. Petitioner's *right* shoulder also had full ROM – but pain with overhead motion, 3+/5 strength, and positive impingement signs. *Id.* After reviewing the imaging, Dr. Boin assessed right-sided "rotator cuff tear arthropathy" – and utilized more specific diagnostic codes for rotator cuff tear and secondary osteoarthritis. *Id.* He administered a right-sided subacromial steroid injection, and discussed other treatment options including surgery if the right-sided symptoms did not improve. *Id.* at 4-5.

On October 13, 2022, Petitioner returned to the Orthopedic Health of Kansas City practice, meeting with C. Craig Satterlee M.D.[15] Petitioner reported "continued trouble" with her left shoulder, neck, headaches, and back. Ex. 17 at 4. However, those areas were not evaluated or assessed. *Id.* at 4-6. Her chief complaint was right shoulder pain; despite a past diagnosis of rotator cuff arthropathy, she "had good function without a lot of pain" until about March 2022. *Id.* Despite the recent PT, steroid injection, and daily ibuprofen, the right shoulder had ongoing pain of 7-9/10, decreased ROM, and atrophy.

---

[14] Specifically, the left shoulder had active flexion to 90 degrees and external rotation was 40 degrees. Passive flexion was 120 degrees, external rotation was 45 degrees, and strength was -3/5. Ex. 12 at 18.

[15] Petitioner was referred to the October 2022 orthopedic appointment by cardiologist Steven K. Starr, M.D. Ex. 17 at 4, 6. No corresponding records from Dr. Starr have been filed. *But see e.g.,* Ex. 10 at 387 (*June 2021* annual appointment with Dr. Starr).

7

*Id.* at 4-5. Dr. Satterlee assessed a right-sided "significant chronic rotator cuff tear with developing osteoarthritis of the glenohumeral joint, so-called rotator cuff arthropathy," for which he suggested a reverse total shoulder replacement. *Id.* at 6.

At a March 2023 annual wellness visit, the PCP recorded that Petitioner was doing well except for "continue[d…] problems with right shoulder, right knee, and low back pain." Ex. 15 at 17. She reported riding a stationary bike and walking for exercise. *Id.* No positive physical exam findings were recorded. *Id.* at 20-21. The PCP prescribed Meloxicam 15mg for her low back pain. *Id.* at 21.

Roughly seven months later, in October 2023, the PCP recorded that Meloxicam had not been very helpful for Petitioner's worsening back pain. Ex. 15 at 26. CT scans found degenerative changes throughout the cervical and thoracic spine. *Id.* The PCP suggested different medications, pain management consultation, and PT for her back complaints. *Id.* at 26-28.

At a March 2024 annual wellness visit, Petitioner's chief concern was "[C]ontinue[d] significant limitation of the *left* shoulder due to history of rotator cuff surgery. She still has weakness in that arm and cannot lift past 75-90 degrees forward and lateral but "manages. Diclofenac remains helpful for any MSK discomforts." Ex. 15 at 3. On exam, the left shoulder's ROM was "somewhat limited past 90 degrees of elevation, otherwise strength normal and tone intact." *Id.* at 8. The PCP suggested following up with an orthopedist as needed for this complaint. *Id.*

Instead five months later, Petitioner returned to Preferred PT (after a two-year absence). The therapist recorded that their previous four sessions had delivered "slight progress in terms of mobility and pain reduction, and [Petitioner] opted to continue on home basis." Ex. 18 at 25. As of the August 8, 2024 reevaluation, Petitioner had 9/10 pain, decreased ROM, and "significant difficulty with reaching OH [overhead] and lifting light items at home." *Id.* at 25-27.  By the fourth session on August 23rd, she achieved "slightly increased" PROM but "significant pain at end ranges." *Id.* at 31.

On September 16, 2024, Petitioner returned to the Orthopedic Health of Kansas City practice, meeting with Dr. Cowan. Ex. 17 at 8. The recorded history of present illness focuses on her left shoulder but incorrectly states that she underwent surgery on the right side. *Id.* The exam and assessment document *bilateral* shoulder pain, decreased ROM and weakness. *Id.* at 8-9. Dr. Cowan reviewed that a repeat MRI of the left shoulder found "no change in moderate tendinopathy of the supraspinatus, infraspinatus, and subscapularis tendons without discrete tears" – but the previously-seen "glenohumeral arthritis has worsened, now moderate to severe." *Id.* at 9. Dr. Cowan's assessment

repeats: "She had a recent MRI showing moderate to severe glenohumeral degenerative joint disease," for which he provided a glenohumeral joint steroid injection with the consideration of a total shoulder replacement at least 3 to 6 months later. *Id.* at 10, 12. Dr. Cowan also assessed the right shoulder with "known right shoulder rotator cuff arthropathy," also warranting a future total shoulder replacement. *Id.* at 10. No further records have been filed.

I have also reviewed Petitioner's testimonial statements. In part, she describes that her right shoulder had "healed," but was then re-injured due to her left-sided SIRVA with surgical intervention and immobilization. Ex. 2 at ¶ 18; Ex. 16 at ¶ 4. As of July 2024, Petitioner reports ongoing bilateral shoulder injuries which continue to disrupt her daily activities including getting dressed, using the computer, lifting weights and cardiovascular exercise, and sleep. Ex. 16 at ¶¶ 4-6.[16] She also faults her left shoulder pain and tension for secondary neck pain, back pain, and headaches. *Id.* at ¶ 7. As of July 2024, she was planning to undergo additional PT due to hesitance about additional surgery at her age – but remained concerned that her bilateral shoulder injuries are permanent. *Id.* at ¶¶ 9-10.

## IV.   Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A full review of the record demonstrates that the September 23, 2021 vaccine administration was followed by a left-sided SIRVA that was severe, but somewhat limited in duration. As a preliminary matter, it is emphasized that despite most likely inaccurate medical records indicating otherwise, I have not found preponderant evidence of any prior left shoulder pain or dysfunction. And the vaccination led to formal medical treatment beginning just 12 days later, and consistently thereafter. Petitioner repeatedly rated her pain towards the top of a ten-point scale, and had moderately limited ROM, despite over-

---

[16] Petitioner also says that her injuries "made it difficult for me to perform… work." Ex. 2 at ¶ 3. But upon the at-issue vaccination in October 2021, she was 67 years old and already retired. *See, e.g.*, Ex. 3 at 16; Ex. 4 at 135.

9

the-counter pain medications and two steroid injections.

And despite Respondent's objection (Response at 11), I conclude that Petitioner's pre-existing insomnia was *exacerbated* by the SIRVA in its acute phase – as evidenced by the new short-term prescription of Vicodin "for a more comfortable night's sleep" (Ex. 4 at 136). Her consultations with multiple orthopedists, arthroscopic shoulder surgery five months into the course, and 17 PT sessions across two facilities also underscore the acute injury's severity.

However, the following damages award also recognizes that Petitioner initially deferred formal PT – instead attempting more conservative home exercises, in the injury's early phase. And she has not established above-average disruptions to her personal life – as a retired individual without significant professional or personal obligations.

I recognize that upon transitioning from formal PT to a home exercise program in mid-May 2022, Petitioner still had high pain ratings and had not met her goals – supporting the conclusion that her left SIRVA had not substantially resolved by that time.

However, Petitioner *concedes* that her orthopedic surgeon documented *full* ROM and strength in her left shoulder on August 25, 2022 (11 months post-vaccination). Brief at 15, citing Ex. 8 at 2. Afterwards, there is no objective documentation or formal treatment of a left shoulder injury for roughly eighteen months. *Compare* Ex. 17 at 4 (October 2022 report by Petitioner of ongoing left shoulder "trouble" - but no corresponding exam, assessment, or treatment of the left shoulder by a different orthopedist); Ex. 15 at 17-21 (March 2023 primary care annual exam with no ongoing left shoulder injury documented); Ex. 15 at 26-26 (October 2023 primary care appointment). A left shoulder injury is later documented objectively, and related back to the vaccination by *Petitioner* – but her providers did not expressly endorse that link. *See, e.g.,* Ex. 15 at 3-8; Ex. 18 at 25-27. Most importantly in September 2024, the orthopedic surgeon Dr. Cowan assessed her left shoulder glenohumeral joint arthritis as "worsened," currently "moderate to severe," and the appropriate focus of treatment with a steroid injection. Ex. 17 at 9-12.

Here, while Respondent conceded entitlement for a Table SIRVA, he contends that the corresponding damages should be limited – and particularly should not include later complaints attributed to worsening osteoarthritis, which is not a vaccine-caused condition. Response at 1-2, citing *Agate v. Sec'y of Health & Hum. Servs.*, No. 18-1397V, 2024 WL 4164241 (Fed. Cl. Spec. Mstr. Aug. 7, 2024) (dismissing a Table SIRVA, and an alternative causation-in-fact claim, due to treaters' and experts' opinions regarding similar chronic degenerative changes). Indeed, another special master recently found that similar findings *precluded* an entitlement ruling of a Table SIRVA. Specifically: "Both

parties' experts agree that [the *Pulsipher*] petitioner's ultimate treatment for her condition – her reverse shoulder replacement – was indicated due to the presence of osteoarthritis that failed conservative treatment for her condition – her reverse shoulder replacement – was indicated due to the presence of osteoarthritis that failed conservative treatment measures. Given all this, petitioner [in *Pulsipher*] cannot reasonably assert that her glenohumeral osteoarthritis 'would not' explain her symptoms." *Pulsipher v. Sec'y of Health & Hum. Servs.*, No. 21-2133V, 2025 WL 1364203, at *10 (Fed. Cl. Spec. Mstr. Apr. 24, 2025), *mot. for rev. den'd*, -- Fed. Cl. – (slip op. Sept. 3, 2025). Petitioner has not offered any response on this point. Thus, SIRVA damages award cannot be extended to these more attenuated and likely-unrelated complaints.

In contrast, I find preponderant evidence of an overuse injury to the opposing right shoulder that *can* reasonably be viewed as a sequela of the left SIRVA. Despite some prior history, Petitioner's right shoulder had not been actively treated for roughly two years pre-vaccination, and it was apparently pain-free with normal ROM and strength. *See, e.g.*, Ex. 4 at 181; Ex. 7 at 38, 50. The left SIRVA's surgical intervention was followed by one month of complete immobilization, requiring Petitioner to rely entirely on her opposing right side, and she was promptly documented to have a new right-sided injury. Ex. 8 at 16-19; Ex. 13 at 3-5. Petitioner persuasively notes that her medical providers recorded this explanation, even if they did not expressly endorse it. Reply at 11.[17] That likely explains the right shoulder's inclusion in her formal PT course, and treatment with one subacromial steroid injection, in 2022. Notably at that time, the right shoulder MRI findings included tearing and bursitis. *See* Ex. 11 at 7. However, there is insufficient explanation for how the left-sided SIRVA would explain Petitioner's *long-term* right-sided complaints, especially in light of her providers' focus, again, on degenerative changes which would justify a total shoulder replacement.

Turning to a specific valuation of past pain and suffering, Petitioner seeks $150,000.00, but Respondent supports nearly 50% less - $87,500.00. Respondent's cited cases are not informative, however. Upon awarding $97,500.00 in *Shelton*, I balanced a more extensive treatment course (with three steroid injections, and PT both before and after surgical intervention) against significant treatment delays (three months, and

---

[17] *Accord McDorman v. Sec'y of Health & Hum. Servs.*, No. 19-814V, 2021 WL 5504698, at *3 (Fed. Cl. Spec. Mstr. Oct. 18, 2021) (reflecting an orthopedist's assessment that the petitioner's "right shoulder pain was most likely a direct result of having to rely on it following her left shoulder surgery and throughout the duration of her post-operative recovery"); *compare with, e.g.*, *Havis v. Sec'y of Health & Hum. Servs.*, No. 21-0583V, 2024 WL 5039036, at *4 (Fed. Cl. Spec. Mstr. Nov. 1, 2024) (not accepting allegation of an overuse injury first documented over eight months after substantial recovery from the SIRVA) and *Richardson v. Sec'y of Health & Hum. Servs.*, No. 20-0674V, 2023 WL 6180813, at * (Fed. Cl. Spec. Mstr. Aug. 16, 2023) (17-month gap between the SIRVA's acute course and new complaints regarding the opposite shoulder).

another five months) and low pain levels. *See* Response at 15, citing *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093 at *7-8 (Fed. Cl. Spec. Mstr. May 21, 2021). Ms. Strehl has documented a more consistently severe acute injury, warranting a higher award.

Similarly my award of $95,000.00 in *Hunt* recognized that petitioner's 26 PT sessions and three steroid injections, but also significant periods of pain relief from the latter. Response at 15, citing *Hunt v. Sec'y of Health & Hum. Servs.*, No. 19-1003V, 2022 WL 2826662, at *8-9 (Fed. Cl. Spec. Mstr. June 16, 2022). Ms. Strehl attended fewer PT sessions (just 17), but her pain was not relieved by steroid injections or other prescription medication, she began treatment sooner (12 days, versus 18 days), and she underwent surgery sooner – all indicating that the SIRVA was more severe in its initial period (notwithstanding my finding of a substantial recovery post-surgery).

Finally, I reject Respondent's request to apply an offset for the settlement of Petitioner's prior civil action (Sur-Reply at n. 4), because that settlement was for a surgically corrected *knee* injury. Ex. 19 at 6, 8; *see also e.g.*, Ex. 7 at 4-6, 13-14, 23-37.

Petitioner's valuation and cited cases are more helpful. *See generally* Petitioner's Brief; Reply; and Sur-Reply. In particular, she persuasively argues for a "floor" of the $130,000.00 awarded in *Anglewicz* – which also involved formal treatment beginning less than one month post-vaccination and consistently thereafter; OTC and prescription pain medications; two steroid injections without significant pain relief; an MRI finding both tearing and osteoarthritis; surgical intervention at about six months post-vaccination, and substantial recovery within a year. *See* Reply at 16-17, citing *Anglewicz v. Sec'y of Health & Hum. Servs.*, No. 20-1504V, 2024 WL 2702415, at *4-5 (Fed. Cl. Spec. Mstr. Feb. 8, 2024). Even recognizing that the *Anglewicz* petitioner deferred post-surgical formal PT because of the emerging Pandemic, which was not implicated here, Ms. Strehl had a somewhat more extensive treatment course for her SIRVA, which also resulted in temporary overuse of the opposing shoulder.

However, Petitioner's award should be less severe than that in cases like *Gao* – in which I awarded $155,000.00 to a petitioner who had undergone surgery, received *six* steroid injections, attended *64* formal PT sessions, and experienced residual effects for at least 21 months. *Gao v. Sec'y of Health & Hum. Servs.*, No. 21-1884V, 2023 WL 6182455 (Fed. Cl. Spec. Mstr. Aug. 18, 2023).

**Based on my review of the evidence, these case comparisons, and my experience overall, I find that a fair and appropriate award for Petitioner's past pain and suffering is $140,000.00.**

## Conclusion

For all the reasons discussed above and based on consideration of the entire record, **Petitioner is entitled to damages in the form of a lump sum payment of $140,000.00, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.**

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[18, 19]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[18] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

[19] Finally, I note the representation that "*If* Petitioner undergoes an additional surgery, Petitioner will move for leave to file an additional reply brief to amend Petitioner's position on damages to account for the additional surgery related to Petitioner's pain and suffering analysis." Reply (ECF No. 31) at n. 1, and Sur-Reply (ECF No. 37) at n. 1 (emphasis added). I am not inclined to grant any such motion out of the *general* interest of achieving final judgments (indeed, Petitioner has "confirmed that this case is ripe for a decision…" and requested its adjudication without further delay, *see* Sur-Reply, *accord* Informal Communication entered Sept. 24, 2025), as well as my *case-specific* analysis that Petitioner's SIRVA was of limited duration and that her subsequent complaints are likely unrelated.